Charles **ARGENTINE**, et al., Plaintiffs,

v.

**UNITED STEEL WORKERS ASSOCIATION**, et al., Defendants.

No. C2–96–463.

United States District Court, S.D. Ohio, Eastern Division.

Oct. 19, 1998.

**810**

Robert S. Moore, Youngstown, OH, Ira J. Mirkin, Timothy R. Piatt, Green Haines Sgambati Murphy & Macala, Youngstown, OH, for Charles Argentine, John Gooch, Clarence Wingo.

Stewart Ralph Jaffy, Stewart Jaffy & Associates, Columbus, OH, Jonathan D. Hacker, Washington, DC, Warren G. Kohlman, Washington, DC, Jeffrey Freund, Bredhoff & Kaiser, Washington, DC, for United Steel Workers of America, Santo Santoro, James A. Kirkpatrick.

## OPINION & ORDER

MARBLEY, District Judge.

This opinion and order sets forth the full reasoning in support of the Court's September 3, 1998 Interim Order which ruled on the parties' Cross Motions for Summary Judgment, and rules on the § 411(a)(1) and state law issues.

### Background

Plaintiffs Charles Argentine, Clarence Wingo and John Gooch filed this case against United Steel Workers of America on May 13, 1996. The three Plaintiffs brought five claims, both federal and state, against the International Union ("the International") based upon its removal of them from office and its establishment of a trusteeship over their Local Union ("the Local"). Two of Plaintiffs' claims, those of defamation and intentional infliction of emotional distress, were also brought against two individual members of the Union, Jim Kirkpatrick and Santo Santoro. Additionally, Plaintiff Argentine made a claim against both the International and Kirkpatrick for being ejected from a Union meeting.

Defendants filed a Motion for Summary Judgment in April of 1997. Plaintiffs' Memorandum Contra, filed in June, served also as a Motion for Partial Summary Judgment on their behalf.

### Undisputed Facts

The heart of this case concerns the lawfulness of the trusteeship imposed upon the Local by the International during a period in which both organizations were negotiating a new contract with Timet, the Local's employer in Toronto, Ohio.

Plaintiffs Argentine, Wingo and Gooch were elected to the Local Union offices of President, Vice–President and Financial Secretary, respectively, in late April of 1994. They took office on May 3, 1994. In June, negotiations began with Timet for a new collective bargaining agreement. Plaintiffs appointed themselves and seven others to a negotiating committee which conducted the negotiations on the Union's behalf. Between May and July, the committee spent thirty

days meeting with the employer, and eleven days meeting amongst themselves. For each of these days, the committee members were being paid "lost time" (if work was missed) or "service time" (if work was not missed), and some were being paid "lost overtime" if they would have earned overtime that week. The local officers also were receiving their salaries as officers during this time.

The Union voted to strike on July 31, 1994. The strike lasted until October 15, 1994, when an International District Director, Jim Bowen, negotiated a temporary, indefinite deal with Timet. Bowen had the authority to enter such a contract on behalf of the Union because, by its constitution, the International is the exclusive bargaining representative of the Union, and may enter contracts on the Local's behalf. Although the Local was involved in negotiating the new agreement before the strike, the International Union has ultimate authority, and the indefinite deal instituted by Bowen was lawful. The Local was not in favor of the indefinite temporary deal struck by Bowen and, after six months, requested Bowen to terminate the deal so negotiations could resume.

During union meetings between June 1994 and February 1995, a Local faction, allegedly comprised of political opponents of Plaintiffs, raised concerns about the financial practices of the officers and members of the negotiating committee. A few times, meetings headed by then-president Argentine became chaotic when these issues arose, and Argentine would allegedly adjourn them prematurely. Apparently, members of the Local also filed charges of financial malfeasance against Plaintiffs with the United States Department of Labor ("DOL").

On February 23, 1995, at the prompting of the International Staff Representative, Andy Powley, Bowen requested that an audit be performed of the Local's books. On April 10, 1995, at Plaintiffs' insistence, Bowen notified the employer that the Union wished to terminate the indefinite agreement and resume negotiations. On May 22, 1995, at Plaintiffs' insistence, Bowen notified the company that the temporary agreement would terminate on June 22, 1995. In late April and early May of 1995, negotiations resumed concerning a new collective bargaining agreement.

Also in late May, the audit was completed by auditor Ron King. The audit covered the period from January 1, 1993 to December 31, 1994, and showed expenditure over income in excess of $108,000. The audit allegedly showed that the negotiating committee was engaged in excessive spending as it related to income, that one member of the committee had been paid improperly, that a Certificate of Deposit of the Local's had been cashed in prematurely, and a penalty incurred, but that the penalty had not been reflected in the books, and that a donations fund was largely unaccounted for.

Sometime in the Spring of 1995, the DOL requested and took control of the Local's books in response to the complaints about financial practices lodged against the Local's officers and negotiating committee. Around the same time the audit was completed, Timet had communicated its final offer to Bowen regarding the new collective bargaining agreement. At their last meeting with Bowen in May, Plaintiffs made clear that they were going to recommend that Local not accept Timet's final offer. On May 30, 1995, Charles G. Canelakes, Head of the IU Audit Dept., wrote a memo to Jim Bowen recommending that a trusteeship be imposed due to the results of the audit. The recommendation made by Canelakes was approved by District Director Frank Vickers on June 5, 1995, who submitted it on to the International President, George Becker.

On June 9, 1995, letters were sent to each of the Plaintiffs by James English, acting on behalf of the International President, informing them that a trusteeship was being imposed effective June 7, 1995 and that they were being removed from office. The letter described the reason for imposing the trusteeship as "to assure the performance of the collective bargaining process or other duties of a bargaining representative." It made no mention of the audit or any alleged financial malpractice. Furthermore, the letter stated that this action "should not be viewed as in any way reflecting on your performance as an officer."

Ten days later, Bowen revoked the notice to terminate the indefinite agreement and extended the agreement again indefinitely.

The parties dispute whether this timing was merely coincidental. On June 23, 1995, Bowen entered into a four year collective bargaining agreement with Timet on behalf of the Local. Instead of seeking ratification of the agreement at a Local meeting (where Plaintiffs would presumably attend and voice their objection), Bowen arranged for the ratification vote to be held by a mail poll. Plaintiffs were outspoken in their opposition to ratification of the deal Bowen had struck, and made their views known through conversations and flyers at the plant, and through the news media. On June 28, 1995, Jim Bowen, who by then had taken the position of Special Assistant to the International President, sent the ballots to the Local members, along with a letter urging ratification of the agreement. On July 10, 1995, the agreement was ratified by a mail vote of 149 to 106.

On August 7, 1995, Plaintiffs were notified that a hearing would be held on August 9, 1995 to "investigate the trusteeship" imposed by the International Union. Plaintiffs attended the hearing before the International's Commission, where only one witness was called to testify against them—Ron King, the auditor. Plaintiffs claimed they were not aware the hearing would concern financial matters and requested a postponement, which was denied.

Plaintiffs cross-examined King as best they could, and argued to the Commission that they were "ousted" because of their opposition to the new collective bargaining agreement struck by Bowen. Because the Local's books had been seized by the DOL for its investigation, neither King nor the Commission had any of the supporting documents for the audit. The Commission took the matter under advisement because they wanted to review the Local's books at the DOL's office before reaching a conclusion. The two-member Commission subsequently reviewed the Local's 1994 books at the DOL, and produced a Report and Recommendation concluding that the trusteeship was necessary, and that Plaintiffs should be barred from holding office for three years.

The Report was completed and sent to the International President around September 20, 1995. By October 24, Plaintiffs had yet to hear about the Commission's determination, and sent letter to the Commission requesting its Report.

On November 17, the Commission Report was sent to two of the three Plaintiffs without the attachments referenced in the Report. Along with the Report was a letter notifying Plaintiffs of the International Executive Board Appeal Panel hearing to be held on November 29, 1995. Plaintiffs state that they did not receive the Report and notice letter until November 24. Argentine further states that he did not receive the Report at all until he called on November 27 to request it and the attachments. Only the Report, however, not the attachments, was sent to Argentine that day.

On November 29, 1995, the Appeals Panel hearing took place, and all three Plaintiffs attended. No witnesses or evidence were put forward. Rather, the Appeals Panel read the Report into the record and then gave Plaintiffs thirty minutes to rebut its findings. Plaintiffs presented both an oral statement and a written statement with supporting documentation attempting to rebut the findings of financial malpractice. Plaintiffs challenged not the fact that they spent substantial sums of money, but argued that their expenditures were justified under the Local's by-laws and voted upon by the membership. On December 20, 1995, Plaintiffs sent a letter in support of their rebuttal to the Panel. On January 11, 1996, the International Executive Board adopted the Appeals Panel recommendation to adopt the Commission Report with one exception: Plaintiffs were no longer barred from holding office.

On January 17, 1996, a letter was sent to Plaintiffs informing them of the Appeals Panel and Executive Board's decision. On February 23, 1996, Plaintiffs appealed that decision to the International Convention, and, at least by early July, Plaintiffs were notified that the Convention hearing would take place on Friday August 2, 1996. The presence of the Commission members was requested by the Convention hearing panel, but they did not attend. In a July 23, 1996, letter to International Secretary General Gerard, Plaintiffs requested the presence of "all witnesses, who in your estimation, testified

against us, or had any part of recommending the trusteeship." Only the auditor Ron King, Jim Bowen and Santo Santoro attended to testify. Plaintiffs also demanded the production of the attachments to the Commission Report by July 29, 1996. Plaintiffs received the attachments a few days before the hearing.

At the Friday hearing in Pittsburgh, the Convention panel thoroughly examined King about the Local's financial affairs. Bowen also testified. Plaintiffs were given the opportunity to cross-examine both witnesses, but spent much of the time with Bowen questioning him about the objectionable provisions of the "concessionary" collective bargaining agreement he had struck with the employer on their behalf. The Convention panel directed Plaintiffs to focus on the allegations of financial malpractice. Plaintiffs had little to say about the financial charges, except that all their expenditures either had paid for the prior administration's acts, or were justified by the by-laws and tradition, and had been voted by the membership.

Nearing the end of this hearing, the head of the panel asked Plaintiffs whether they believed the hearing to have been full and fair. Plaintiffs stated they did not believe it was because they had only received the attachments to the Commission Report a few days earlier, and had not been given adequate time to go through the records to rebut the allegations of financial malpractice. The Convention hearing panel then requested that Plaintiffs step outside so it could vote, and in voting, decided to give Plaintiffs several extra days to go over the attachments and present any additional rebuttal on the following Tuesday before it ruled.

When the panel called everyone back in, Plaintiffs could not be found. They had apparently misunderstood the panel's directive to step outside, and had left the city. The panel attempted to reach Plaintiffs that night and over the weekend and finally reached Plaintiff Gooch at home on Sunday. Gooch contacted Wingo and Argentine, and Plaintiffs communicated to the panel on Monday that they would not attend on Tuesday as they had difficulty getting off work to review the attachments and again testify. The panel met on Tuesday without Plaintiffs and inquired further of auditor King regarding the Local's financial practices while under the authority of Plaintiffs. The panel consistently returned to the question of whether, in light of the information contained in the audit, an emergency trusteeship was justified under the constitution. Ultimately, the panel voted in the affirmative, affirming the Executive Board's ruling and adopting the Commission Report.

Plaintiffs filed a complaint with the DOL regarding the trusteeship, but in October of 1996, the DOL concluded legal action was not warranted. The DOL's statement of reasons for its decision mentioned the questionable financial transactions revealed in the audit and its view that, even if the trusteeship was imposed to reach a new CBA, it was lawful in light of the strike and the prolonged contract negotiations. In April 1997, new officer elections were held in the Local Union, and when the newly-elected officers took office in May, the trusteeship terminated.

## ANALYSIS

Plaintiff brought this action on May 18, 1996. Plaintiffs' complaint has five counts, each of which is considered below.[1]

---

**1.** (1) Count One alleges plaintiffs' removal from office violated 29 U.S.C. § 411(a)(5) (protects procedural rights of union members prior to internal union discipline); § 411(a)(1) (protects equal rights of union members to vote and participate in union affairs); and §§ 411(a)(2) & 529 (protects union members rights of free speech and assembly); (2) Count Two alleges the International Union imposed an administratorship on Local 5644 for an unlawful purpose in violation of 29 U.S.C. § 462 and without a fair hearing in violation of 29 U.S.C. § 464(c); (3) Count Three alleges the International Union breached contracts within the meaning of 29 U.S.C. § 185 by (I) violating its Constitution and Bylaws while imposing the administratorship on Local 5644; and (ii) violating Local 5644's Bylaws when it ratified the July 1995 collective bargaining agreement in a mail ballot election in which all bargaining unit members were permitted to vote; (4) Count Four alleges defendants defamed plaintiffs and intentionally inflicted emotional distress upon them in violation of state law; and (5) Count Five alleges defendants violated Local 5644's bylaws when it amended those bylaws and that defendants violated Plaintiff Argentine's right to freedom of speech and assembly under 29 U.S.C. § 411(a)(2) by ejecting him from a union meeting.

### A. The Trusteeship Was Not Properly Imposed.

The three claims under Title I of the Labor Management Reporting and Disclosure Act ("LMRDA") in Count One are dependent upon a finding that the imposition of the trusteeship by the International was unlawful. *See, e.g., Farrell v. IBT, CW & HA,* 888 F.2d 459, 462 (6th Cir.1989) ("Election of local officials, however, is prima facie inconsistent with control of the local by a trustee. The whole point of a trusteeship is that someone has judged that control of the local by a central authority is necessary. ... If the trusteeship ... is a fraud, the statute provides a mechanism ... to prove it and thereafter recover their Title I rights. But, let them not put the cart before the horse."). For a union local to challenge successfully the imposition of a trusteeship under the LMRDA, 29 U.S.C. § 464(c), it must either demonstrate that the trusteeship was not imposed in conformity with procedural requirements or it must produce clear and convincing proof that the trusteeship was not established or maintained in good faith for a purpose allowed by statute. *See Teamsters Local Union No. 406 v. Crane,* 848 F.2d 709, 712 (6th Cir.1988); 29 U.S.C. § 462. "Procedural requirements" refer to the Union's constitution and by-laws, and authorization or ratification after a full and fair hearing. 29 U.S.C. § 464.

#### 1. The trusteeship was not imposed in conformity with the Union constitution and bylaws.

It is undisputed that the International imposed the trusteeship on the Local without prior notice or hearing. Plaintiffs argue the trusteeship was therefore not in accord with Article IX, Sec. 1 of the International Union's constitution, which requires prior notice and hearing. The International argues, however, that it was operating under Article IX, Sec. 3, the "emergency" section of the constitution, which allows such an act:

[I]n case of emergency, where in the opinion of the International President the best interests of the International Union or Local Union require, the International President is empowered to suspend officers of, and establish an administratorship over, the affairs and property of a Local Union prior to notice and hearing.

Plaintiffs argue that the International never claimed an emergency existed and made no mention of an emergency in the internal memo recommending a trusteeship, the letter imposing the trusteeship, or the hearing notice provided to Plaintiffs. Further, Plaintiffs argue, no witness at any of the hearings ever claimed an emergency existed, and none of the Commission or Appeals Board reports found an emergency existed, and the IU never presented any evidence that a financial emergency existed in June 1995. Plaintiffs argue that at that time the local was doing fine financially.

While it is certainly troubling that neither the internal memo, the letter imposing the trusteeship, nor the hearing notice ever claimed an emergency existed, and Sec. 3 was never expressly invoked by the International in communications to Plaintiffs, whether an emergency existed was indeed the subject of discussion among the Convention Appeal Committee. This was the standard by which the Committee judged the International's actions; and ultimately, it was the basis for that Committee's affirmance of the Commission Report upholding the trusteeship.

Plaintiffs argue that the International's invocation of Sec. 3 is "after the fact" and should not be accepted by this Court. Other courts in similar circumstances, however, have assumed that the International Union was invoking the emergency provision of its constitution. *See, e.g., IBT v. Local Union No. 810,* 19 F.3d 786, 792 (2d Cir.1994) ("[a]s IBT sought to impose a temporary trusteeship on Local 810 without holding a prior internal union hearing, we assume it was invoking the emergency provisions of Article VI, § 5(a) of its constitution."). This Court does the same today. The failure of the International Union to invoke expressly the emergency provisions of its constitution does not prevent this Court from analyzing the legality of its actions under those provisions. Whether an actual emergency existed, however, is a question of fact for the jury, as it goes directly to whether the International Union imposed the trusteeship in good faith.

Under the International's constitution, the imposition of a trusteeship without prior notice or hearing is permissible when an emergency exists, and a trusteeship is required for the best interests of the Union in the opinion of the International President. Notice must be given, however, and a full and fair hearing conducted "within sixty (60) days following the emergency action." In this case, the trusteeship was imposed effective June 7, 1995, and the first hearing was held on August 9, 1995, within about sixty days of the emergency action. Substantial compliance with the constitutional requirements is permissible. *See Jolly v. Gorman,* 428 F.2d 960, 965 (5th Cir.1970).

 There is no dispute that Plaintiffs had notice of the hearing, and all three were present. Thus, the International Union would have complied with the procedural requirements of its emergency provisions if the hearing was a "full and fair one." However, Plaintiffs argue the International violated its own constitution in three respects.[2] First, the letter imposing the trusteeship was not "sufficiently specific" to enable Plaintiffs to prepare a defense. Second, Plaintiffs were not given adequate notice of the hearing since they received notice less than forty-eight hours before the hearing began. Third, the hearing notice was not "sufficiently specific" to enable Plaintiffs to prepare a defense.

Before this Court addresses the "fairness" of the hearing, one clarification must be made. The constitution describes the hearing which is to be conducted within 60 days after emergency action as "a hearing as specified above." The specifics listed above in the constitution which relate to hearings refer to "a full and fair hearing consistent with, to the extent applicable, the procedure for conducting hearings under Article XIII." The procedures enumerated under Article XIII include requirements that (1) the charges be sufficiently specific so as to enable the accused to prepare a defense; (2) written notification of the time and place of the hearing; (3) and the hearing shall take place no sooner than two weeks and no later than four weeks after the mailing of said notice.

2. Plaintiffs argue a fourth violation that the International failed to hold a hearing prior to imposing the trusteeship, but as the Court noted

·As Defendants correctly point out, however, the language that refers to the Local Union being afforded a "hearing consistent with ... Article XIII" was deleted from the constitution in 1994 and replaced with simply "The Local Union shall be afforded a full and fair hearing." Thus, the procedures of Article XIII do not apply. That is not to say that the requirements listed under Article XIII cannot be viewed by this Court as an example of what a full and fair hearing should require according to the International's constitution. It is strong evidence of what the International deems "full and fair." General notions of due process can also suffice. The Sixth Circuit has construed the phrase "full and fair" to mean "that traditional concepts of due process should apply" to union hearings. *Kuebler v. Cleveland Lithographers & Photo. U. Loc. 24–P,* 473 F.2d 359, 364 (6th Cir.1973).

Courts considering trusteeship challenges have established certain minimum fair hearing requirements of notice and an opportunity to defend. *See Becker v. Ind. Un. Of Marine & Shipbuilding Wkrs.,* 900 F.2d 761, 768 (4th Cir.1990). One of the requirements that Plaintiffs argue Defendants failed to meet was that the notice should set out in writing the factual basis for alleged violations of law or the union's constitution that justify imposition of a trusteeship. *Id.* The letter imposing the trusteeship contained no factual allegations and cited no evidence. The letter said that the trusteeship and officer removal were "to assure the performance of the collective bargaining agreements and other duties of a bargaining representative," and that it "should not be viewed as in any way reflecting upon your performance as an officer of the Local Union." The letter gave Plaintiffs no notice that the trusteeship was established to "correct financial malpractice" allegedly committed by Plaintiffs, or to "restore democratic procedures," the grounds ultimately cited by the Union for the trusteeship and the removal. In addition, Plaintiffs argue that they received the notice only forty-eight hours before the hearing.

above, the Union's constitution allows a full hearing sixty days *after* the imposition of an emergency trusteeship.

There is no question that the notice of the trusteeship and the hearing provided for the August 9, 1995 hearing was inadequate, and failed to meet any notion of due process. *See, e.g.; Becker,* 900 F.2d at 769. The notice letters were late, and so general and lacking in factual specificity that the Local Union had no fair opportunity to prepare a defense to the charges justifying the trusteeship.

Defendants argue that Plaintiffs had actual notice of the factual allegations motivating the trusteeship, and that even if they did not have adequate notice for the first hearing, Plaintiffs had adequate notice for the remaining two appellate hearings. Defendants refer to conversations two of the Plaintiffs had with representatives of the International Union, in which they were told "there was problems with the finances," and they (Plaintiffs) had "spent a lot of money."

Defendant's actual notice argument is rather tenuous because even these statements do not contain much factual specificity. But Defendants also point out that Plaintiffs were aware that the DOL received a complaint about their financial practices, Argentine was specifically told so by the DOL, and he was questioned by DOL about finances. While this is certainly more evidence that Plaintiffs were aware that their financial practices were under question, there is nothing to connect the DOL investigation with the imposition of the trusteeship, and this information still lacks the factual specificity sufficient to allow Plaintiffs to prepare a defense. Therefore, Defendant's actual notice argument must be rejected.

This Court finds that no "full and fair hearing" was afforded Plaintiffs within sixty days of the emergency action as required by the International constitution, and, accordingly, the trusteeship was not imposed in conformity with the constitution and bylaws.

This ruling does not automatically render the trusteeship invalid under § 464, but simply eliminates the presumption of validity that attaches to a properly imposed trusteeship. As the Sixth Circuit has noted:

> [even proving] that the trusteeship was not established for a purpose allowable under 29 U.S.C. § 462, ... merely eliminates the presumption of validity. It does not resolve the ultimate question. The purposes found in section 462 are the only purposes, which, if pursued in good faith, allow for a presumption of validity. This is not to say that there are not other purposes not found in section 462 that may justify the imposition of a trusteeship but which are not presumptively valid. As the U.S. Senate and House agreed, 'the bill does not specify in detail all of the reasons for which a trusteeship may be imposed.'

848 F.2d at 714. If proving that a trusteeship was not established for an allowable purpose under § 462 does not render the trusteeship unlawful, but only removes the presumption, proving the trusteeship was not established in conformity with the procedural requirements of the constitution and bylaws has only the same effect. Thus, the presumption of validity is eliminated and the question of whether the trusteeship was imposed for a proper purpose is a question of fact for a jury.

## 2. The trusteeship was not authorized or ratified after a full and fair hearing.

Even though the finding that the International failed to conform with its constitution is sufficient to eliminate the presumption of validity, another independent requirement for the presumption is that the trusteeship be ratified after a fair hearing. The statute provides that the trusteeship is given the presumption if it is "authorized or ratified after a fair hearing." Thus, the adequacy of the notice for the two appellate hearings must be examined.

It appears that a fair hearing is sufficient as long as "the hearing follows the imposition of the trusteeship with reasonable promptness." *Becker,* 900 F.2d at 769. The determination whether a post hoc ratification hearing was reasonably prompt is fact and case specific. *Id.* (citing *Jolly v. Gorman,* 428 F.2d 960, 968 & n. 2 (ratification hearing held eleven months after trusteeship imposed was fair hearing under the Act)). Therefore, there can be no ratification in the absence of a hearing that was both "full and fair" and sufficiently prompt to satisfy a reasonableness standard.

Plaintiffs first argue that this Court should reject Defendants' argument that the two

appellate hearings may be relied upon as fair hearings because under 29 U.S.C. § 411, Plaintiffs are required to utilize internal Union procedures for only four months before challenging the trusteeship in court, and the two appellate hearings occurred after this four month period. However, this four month exhaustion period under § 411 does not apply where the validity of a trusteeship is being challenged. *See McDonald v. Oliver*, 525 F.2d 1217 (5th Cir.), *cert. denied*, 429 U.S. 817, 97 S.Ct. 61, 50 L.Ed.2d 77 (1976); *Local 57, Intern. Union of Operating Engineers (AFL–CIO) v. Wirtz*, 346 F.2d 552 (1st Cir.1965). This is especially cogent in light of the eighteen month presumption of validity given a trusteeship under § 464.

Second, Plaintiffs argue that the Commission's unfair first hearing forever tainted any subsequent proceedings, because at each subsequent stage, the International merely relied upon the "evidence" purportedly produced before the Commission. While this argument is facially appealing, the evidence produced before the Commission was not the problem. Rather, it was the lack of notice and opportunity to prepare a defense that tainted the first hearing.

Third, and finally, Plaintiffs argue that the two appellate hearings failed to satisfy the "full and fair hearing" requirement. After the Commission hearing, where the auditor testified about the financial practices of the Local and was cross-examined by Plaintiffs, the Commission took the matter under advisement, in part because the auditor did not have for the Commission to review any of the Local's books which supported his audit. The DOL had seized the Local's books as part of its investigation of charges of financial malpractice, and the auditor did not retain copies. Thereafter, the Commission members went to the DOL after the hearing to review the Local's books. By September 20, 1995 the Commission had completed its report upholding the trusteeship based on

the audit and the books reviewed at DOL and sent the report and attachments to the International President.[3] In addition to upholding the imposition of the trusteeship, the Commission ruled that the three Plaintiffs should be barred from holding office for three years.

However, the Commission failed to send the report or attachments to Plaintiffs. On October 24, 1995, Plaintiffs wrote a demand letter to the Commission, but received no reply. On November 17, 1995, the International sent the report (without attachments) to Plaintiffs Wingo and Gooch, who received it on November 24, along with a letter announcing a meeting of the International Executive Board Appeal Panel in Pittsburgh on November 29, 1995. On November 27, Argentine requested a copy of the report and attachments, and the International sent him a copy of only the report that day.

The hearing before the Appeal Panel was held two days later in Pittsburgh, and according to Plaintiffs, the Panel simply read the Commission Report verbatim and told Plaintiffs they had 30 minutes to present their case. The International presented no witnesses or evidence. Plaintiff Wingo read a letter into the record requesting written reasons for their removal, written specifics of charges, the attachments to the Report, and a postponement to allow them time to prepare their defense, all of which the Panel denied. Wingo then read a second letter again requesting the documents relied upon and referred to by the Commission, and presenting a rebuttal with attached exhibits to the allegations contained in the Report.

The Appeals Panel adopted the Commission Report that same day with one exception, refusing to adopt the recommendation that Plaintiffs be barred from holding or running for office for three years. On January 11, 1996, the International Executive Board adopted the report and recommenda-

---

**3.** Plaintiffs argue that the Commission's review of evidence at DOL was done without their knowledge (which is disputed) and prejudiced them because they had no opportunity to rebut that evidence. While it is probably true that Plaintiffs could have gone to DOL to review the books, they never did. While it was no fault of the Commission, the auditor or Plaintiffs that DOL had seized the books, and while it was

presumably to Plaintiffs' benefit that the Commission members wanted to review the books which supported the audit before ruling, it did further prevent Plaintiffs from rebutting the evidence against them and their local union. The Commission should have reviewed the books, copied them, and provided them to Plaintiffs, and continued the hearing.

tion of the Appeals Panel. And on January 17, 1996, the International wrote Plaintiffs a letter informing them of these two rulings. Because they were unaware of the Appeals Panel's ruling until that date, on December 20, 1995 Plaintiffs wrote the head of the Panel another letter in furtherance of their defense. The International failed to reply.

It is clear from the record that the Appeals Panel hearing also failed to meet any standard of due process. Although Plaintiffs were well aware by that time that the International's inquiry was directed at their financial practices, the Commission Report, which was sent to them a mere week or so before the Panel hearing, failed to include the attachments upon which it relied (including the audit), and the notice sent with the Report provided Plaintiffs very little time to prepare any defense to the Report. While the Panel hearing was held within six months of establishing the trusteeship, and therefore, may be called somewhat prompt, it failed to meet any recognized standard of due process, and thus, cannot be called fair. *See Kuebler v. Cleveland Lithographers and Photoengravers Union Local 24–P*, 473 F.2d 359, 364 (6th Cir.1973).

Finally, the Convention Appeals Committee hearing was not "full and fair" within notions of due process. While Plaintiffs major complaints about the "fairness" of this Committee deal with the decision and conclusions reached by it, Plaintiffs also aver they received the attachments to the Commission Report only a few days before the hearing. This delay in the International's production of the supporting documents necessary for Plaintiffs to refute the audit impeded Plaintiffs ability to prepare for the hearing and thus undermined the fairness of this hearing. As the appellate hearings were unfair, they could not serve to ratify or cure the original, flawed hearing.

### B. Plaintiffs' claims in Count I under 29 U.S.C. §§ 411(a)(1), (a)(2) and (a)(5)

#### 1. § 411(a)(1)

Plaintiffs argue that the Supreme Court's reasoning in *Sheet Metal Workers'*

*International Association v. Lynn*, 488 U.S. 347, 354–57, 109 S.Ct. 639, 102 L.Ed.2d 700 (1989) supports their claim that the removal of an elected official could infringe the members' § 411(a)(1) equal rights and privileges "to vote in elections and to participate in the deliberations and voting upon the business of such meetings." In *Lynn*, however, the Supreme Court expressly addressed only (a)(2) rights of free speech and assembly. In addition, Plaintiffs' right to vote in elections and to participate in Union elections was not affected by their removal from office because they were not removed from union membership. Courts considering this Title I claim have required that the challenged action directly affect or alter the union member's rights *qua* member. Thus, the question is whether Plaintiffs' membership rights in the union were directly infringed by action taken with respect to their employment status as officers. *Franza v. IBT, Local 671 and Thomas Robidoux*, 869 F.2d 41 (2d Cir.1989). This Court finds they were not.

After their removal as officers, Plaintiffs still enjoyed all of the rights listed in § 411(a)(1). They could still "nominate candidates, [ ] vote in elections or referendums ... attend membership meeting and [ ] participate in the deliberations and voting upon the business of such meetings." By its plain language, § 411(a)(1) protects the rights of members in their capacity as union members, not officials. Plaintiffs rights as members were not affected by the imposition of the trusteeship. *See, e.g., Adams–Lundy v. Association of Professional Flight Attendants*, 731 F.2d 1154 (5th Cir.1984). Therefore, Defendants motion for summary judgment on this issue is **GRANTED**.

#### 2. § 411(a)(2)

Defendants argue that Plaintiffs have no cause of action under § 411(a)(2), which guarantees members' free speech, because Plaintiffs must allege and show a pattern of suppression of internal union dissent before they can recover, and no such allegation has been made here.[4] Defendants are

---

4. Plaintiffs also cite 29 U.S.C. § 529 in making this claim, but this Circuit has held that removal of an officer does not constitute "discipline" within the meaning of this provision. *See Harvey v. Hollenback*, 113 F.3d 639, 642–43 (6th Cir. 1997).

wrong. The Supreme Court rejected this argument in *Lynn,* 488 U.S. at 355, n. 7, 109 S.Ct. 639, and held that the removal of an elected official in retaliation for statements made at a union meeting violates § 411(a)(2) of the LMRDA.

Defendants also argue that officer speech (as opposed to member speech) is not protected by Title I under both *Lynn* and the Eleventh Circuit's reasoning in *Dolan v. Transport Workers Union,* 746 F.2d 733 (11th Cir.1984). However, Defendant's argument that *Lynn* implicitly endorsed this approach in its footnote six is not persuasive, and the distinction Defendants urge is not widely adopted. Plaintiffs' claim survives, and the jury shall decide whether the International Union did indeed remove Plaintiffs from office in retaliation for their speech or to correct financial malpractice.

### 3. § 411(a)(5)

Plaintiffs allege that they were not afforded the procedural rights mandated by § 411(a)(5) when a member is "fined, suspended, expelled or otherwise disciplined." Defendants argue that removal from office is not considered "discipline" within the meaning of (a)(5). Defendants are correct.

In *Harvey,* the Sixth Circuit held that the removal from office of an appointed official is not "discipline" within the meaning of "otherwise discipline" in §§ 529 or 609 of the LMRDA. *Harvey,* 113 F.3d at 642–43. In *Finnegan v. Leu,* 456 U.S. 431, 102 S.Ct. 1867, 72 L.Ed.2d 239 (1982) and *Breininger v. Sheet Metal Workers International Association Local Union No. 6,* 493 U.S. 67, 110 S.Ct. 424, 107 L.Ed.2d 388 (1989), the Supreme Court held the term "otherwise discipline" as used in § 609 and § 411(a)(5) has the same meaning in both sections. In addition, "Congress did not intend to include all acts that deterred the exercise of rights protected under the LMRDA, but rather meant instead to denote only punishment authorized by the union as a collective entity to enforce its rules." *Breininger,* 493 U.S. at 91, 110 S.Ct. 424. Plaintiffs therefore have no claim under (a)(5) for their removal from office.

### C. This Court Does Not Have Jurisdiction Over Plaintiffs' § 301 Claims for The International's Alleged Violation of the Local's Bylaws.

*Wooddell v. IBEW, Local 71,* 502 U.S. 93, 112 S.Ct. 494, 116 L.Ed.2d 419 (1991) has been interpreted to state that the constitution of a local union is a contract between the union and its members, and that "a suit on a contract between a labor organization and a member is not within the scope of section 301." *Korzen v. Local Union 705,* 75 F.3d 285, 288 (7th Cir.1996); *see also Agosti v. Libbey–Owens–Ford Co.,* 888 F.Supp. 840 (N.D.Ohio 1994). Since Plaintiffs brought claims against the International for its breach of the Local's bylaws, this Court does not have jurisdiction over those claims. Thus, Claim Two of Count Three and Claim One of Count Five are dismissed for lack of jurisdiction.

### D. Argentine's claim for ejection from a union meeting survives summary judgment.

Argentine claims that his ejection from the meeting at which the Local was improperly enacting amendments to the bylaws violated his rights to free speech under § 411(a)(2). But those rights are expressly subject to the organizations's established and reasonable rules pertaining to the conduct of meetings. The Local has a rule permitting ejection from meetings of people who are called out of order three times. Argentine was instructed that he could raise his comments concerning the proper procedure for amending the bylaws at the end of the meeting during the Good and Welfare section. When Argentine persisted on speaking, he was rapped out of order three times before being ejected.

It is undisputed, however, that Argentine's comments pertained to the business being conducted at the time he chose to speak. The Local was voting to amend the bylaws. Argentine's written complaint about the method the Union used to amend its bylaws was received by the International, and considered favorably, for the International did not approve the amendments and instructed the Local to re-vote on the amendments us-

ing the correct procedure. Thus, Argentine was ultimately vindicated.

The Local Union President at the time, however, would not let Argentine speak about failure to follow procedure before the amendments were voted upon. Rather, he gave Argentine the opportunity to speak at the end of the meeting, after the vote. Arguably, Argentine's speech was in order and proper for consideration at the time. *See Scovile v. Watson*, 338 F.2d 678 (7th Cir. 1964) (must allege that speech was in order and proper for consideration at that time). Thus, this is a question of fact for the jury.

### E. Plaintiffs' State Law Claim of Defamation Survives Summary Judgment, While Their Claim of Intentional Infliction of Emotional Distress Does Not.

Plaintiffs' state law claim of defamation and intentional infliction of emotional distress are predicated upon a series of instances where Union officials Kirkpatrick (then acting-President of the union) and Santoro (a union administrator) allegedly expressed derogatory opinions about Plaintiffs. Plaintiffs allege:

(1) Santoro posted in the plant hand-written posters saying "Crooks are gone" and "You can't believe the thieves." Although it is not established that Santoro wrote these posters, Plaintiffs claim the handwriting on them is similar to a writing which Santoro admits is his.

(2) Santoro received a copy of the Union Commission's report on Plaintiffs and gave it to Kirkpatrick, who ran off fifty copies and distributed them around the plant, with Santoro's knowledge. The report alleged there had been "fraudulent charges of monies," and that Argentine had a "persistent . . . attitude of dictatorship."

(3) During a tour of the plant, Kirkpatrick told a union member (Colgrove) that money was missing because of Plaintiffs, that Kirkpatrick could prove plaintiffs were involved and that they would not return to office. He later repeated these statements somewhere around the plant.

(4) Santoro told union members (Pelley and Townsend) that Plaintiffs stole $100,000, would be indicted and wouldn't be back in office.

(5) After learning of these incidents Plaintiffs wrote to Union President Becker. Sub-Director Bill Rose responded that Santoro did authorize Kirkpatrick to distribute the Commission reports and that Plaintiffs complaints were "without merit."

(6) Argentine felt humiliated, embarrassed, suffered mental and emotional anguish, lost sleep, felt a purring in his chest and curtailed social activities; Gooch felt the same anguish and also gained weight, and suffered marital problems. Wingo had to consult a psychiatrist, take Prozac, and has been unable to work since August of 1996. All of these symptoms were a direct result of the imposition of the trusteeship and the political and social opprobrium Plaintiffs experienced from it.

Plaintiffs have deposition testimony to support all the above claims.

### 1. Defamation

■ In Ohio, defamation is defined as a false statement, made with some degree of fault, reflecting injuriously on a person's reputation, or exposing a person to public hatred, contempt, ridicule, shame or disgrace or affecting a person adversely in his trade, business or profession. *A & B—Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 7, 651 N.E.2d ·1283 (1995). Here, because of their positions as the chief union officers of a large local union which had recently experienced extended media coverage, Plaintiffs were limited public figures. *See, e.g., Miller v. Transamerican Press, Inc.*, 621 F.2d 721, 724 (5th Cir.1980) (in dispute about misappropriation of funds, union officer is limited public figure). As public figures, Plaintiffs must show that the allegedly defamatory statements were made with malice. *Gertz v. Welch, Inc.*, 418 U.S. 323, 327, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). And, to establish malice, "one must show that the publisher acted with knowledge of the statement's falsity or with reckless disregard as to its truth or falsity." *New York Times v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

As to Kirkpatrick, this Court cannot grant summary judgment. In his deposition, Kirk-

patrick explicitly stated that he did not believe Plaintiffs to be thieves or in jeopardy of going to jail:

Q: At any time, did you believe that any of the three Plaintiffs would be indicted by the federal government?

A: No.

Q: At any time did you ever believe that nay of the three Plaintiffs were thieves?

A: No.

Q: At any time did you ever believe that any of the three Plaintiffs were crooks?

A: No.

Q: And at any time did you ever believe that the—any of the three Plaintiffs would be going to jail?

A: No.

(Kirkpatrick Depo. 74). This testimony demonstrates that if Kirkpatrick did, in fact, tell union members that Plaintiffs had wrongly taken money, he committed a knowing, injurious falsehood, which constitutes "malice" and thus defamation. The defamation claim as to Kirkpatrick must remain as to his comments to union members during the plant tour.

Plaintiffs have provided weaker evidence to show that Santoro was aware or had a reckless disregard for his statements, but enough to survive summary judgment. In his deposition, Santoro stated "I couldn't go into details with anybody because I wasn't aware of what the heck happened all the time." (Santoro Depo. 37, 51). If Santoro was, in fact, so confused that he didn't want to go into "details," then he acted with reckless disregard for the truth when he stated during the plant tour that Plaintiffs stole $100,000, would be indicted and wouldn't be back in office. And if he posted the posters saying "Crooks are gone" and "You can't trust thieves," these remarks would also be defamatory, if it was clear that they referred to Plaintiffs. Of course, whether Santoro posted the posters and whether they referred to Plaintiffs are facts that the jury must find.

Plaintiff's claim that the dissemination of the Commission report was defamatory is dismissed. As an official report after a lengthy investigation, there is no evidence that it was published by the union with malice, or that Kirkpatrick or Santoro recklessly disregarded the truth by allowing other members to see the results of the investigation.

Additionally, the International may be held vicariously liable if Kirkpatrick and Santoro acted within the scope of their employment while making these allegedly defamatory statements. Whether these acts fall within the scope of Kirkpatrick and Santoro's employment is a question of fact for the jury to determine. *See Osborne v. Lyles,* 63 Ohio St.3d 326, 587 N.E.2d 825 (1992). Therefore, Defendants motion for summary judgment on Plaintiffs' defamation charge is **DENIED**.

### 2. *Intentional Infliction of Emotional Distress*

To state a claim for intentional infliction of emotional distress, Plaintiffs must allege: (1) Defendants intended to cause emotional distress, or knew or should have known their actions would result in serious emotional distress, (2) Defendants' conduct was extreme and outrageous, (3) Defendants' actions proximately caused plaintiff's emotional injury, and (4) Plaintiff suffered serious emotional anguish. *See Yeager v. Local Union 20,* 6 Ohio St.3d 369, 374, 453 N.E.2d 666 (1983); *Hanly v. Riverside Methodist Hosp.,* 78 Ohio App.3d 73, 82, 603 N.E.2d 1126 (1991).

In terms of the requirement that conduct be extreme and outrageous, the Ohio Supreme Court has held:

Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor and lead him to exclaim, "Outrageous!"

*Yeager,* 6 Ohio St.3d at 374–75, 453 N.E.2d 666.

The key issue is whether Defendants' conduct rose to the level of "outrageousness" as defined by the Supreme Court of Ohio. Quite simply, it did not. Imposing a trusteeship without due process or calling

someone names does not rise to the level of atrocity that is utterly intolerable in a civilized community. No reasonable jury could possibly find this conduct was "outrageous." Additionally, it is well accepted that intentional infliction of emotional distress claims may appropriately be dealt with on summary judgment. *See, e.g., Rogers v. Targot Telemarketing Servs.,* 70 Ohio App.3d 689, 591 N.E.2d 1332 (1990). Therefore, Defendants' motion for summary judgment on Plaintiffs' intentional infliction of emotional distress claim is **GRANTED.**

### CONCLUSION

For the foregoing reasons, the orders given by this Court in its September 3, 1998 remain unchanged. Additionally, Defendants' motion for summary judgment on Claim 2 of Count 1 under § 411(a)(1) and on Plaintiffs' intentional infliction of emotional distress claim is **GRANTED;** and Defendants motion for summary judgment on Plaintiffs' defamation claim is **DENIED.**

**IT IS SO ORDERED.**