

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-29-2004

# Tucker v. Merck Co Inc

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-2616

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Tucker v. Merck Co Inc" (2004). *2004 Decisions.* Paper 576.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/576

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 03-2616

DONNA M. TUCKER; TROY TUCKER,

Appellants

v.

MERCK & CO., INC.

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 02-02421)
Honorable James T. Giles, Chief Judge

Submitted under Third Circuit LAR 34.1(a)
June 28, 2004

BEFORE:  AMBRO, BECKER, and GREENBERG, Circuit Judges

(Filed: June 29,  2004)

OPINION OF THE COURT

GREENBERG, Circuit Judge.

This matter comes on before this court on an appeal by plaintiffs Donna M. Tucker

("Ms. Tucker") and Troy Tucker ("Mr. Tucker") from the district court's order entered on

May 2, 2003, granting summary judgment in favor of defendant Merck & Co., Inc.

("Merck") on both plaintiffs' claims of defamation and Mr. Tucker's claim of invasion of privacy. The district court had subject matter jurisdiction pursuant to 28 U.S.C. § 1332 and we have jurisdiction pursuant to 28 U.S.C. § 1291. For the reasons set forth below, we will affirm.

## I. BACKGROUND

Following are the facts presented in the light most favorable to the Tuckers, the non-moving parties.

### A. Ms. Tucker's Employment History

Merck employed Ms. Tucker from July 1989 until November 1999, when Bristol-Myers Squibb Co. ("BMS") hired her. She alleges that BMS employed her until April 18, 2001, when she filed a written resignation and renewed her employment at Merck. Her April 18, 2001 resignation letter states "I am submitting two weeks' notice of resignation from [BMS]." SA. 61. Thus, her final date at BMS would have been May 2, 2001. However, BMS fired her on April 25, 2001. Merck also fired her on that day, finding that both Merck and BMS had employed her since March 1, 2001.

Ms. Tucker claims that Merck actually did not hire her until April 18, 2001, when it approved her Employee Profile. Based on her past experience at Merck, during which she hired employees, and her conversations with Merck personnel, including her

2

supervisors, Marvin Johnson ("Johnson") and Janet Inman, Merck's administrative assistant assigned to her sales region, as well as Merck's Employee Services and Employee Benefits Departments, she maintains that Merck does not hire anyone until it approves her Employee Profile.[1]  She claims to have discussed this issue with Johnson on numerous occasions, but Johnson denies ever having had such a discussion with her.

Merck first offered Ms. Tucker the new position in December 2000 when Johnson made her a verbal offer, which she verbally accepted.  On or about January 30, 2001, she received a letter of confirmation, stating that her employment would start on February 5, 2001.  Ms. Tucker signed and returned the letter of confirmation.  On February 7, 2001, she completed a Merck application and entered into a non-compete agreement with it.

Between March 1, 2001, and April 18, 2001, Ms. Tucker conducted extensive work activity at Merck.  As detailed below, she used Merck property, attended Merck business meetings, and acted in a managerial capacity.  Ms. Tucker claims that, at Johnson's request, she performed these acts in anticipation of her actual employment. She also claims that, during February and April 2001, she repeatedly told Johnson that she still was working for BMS.

---

[1]One of Merck's Human Resources employees, Jennifer McClellan ("McClellan"), testified that Merck requires an applicant's Employee Profile to be approved before it will hire her.  Nonetheless, McClellan also testified that Ms. Tucker must have been a Merck employee by March 2001 because it invited her to attend employee-only training at that time.

On April 16, 2001, Merck left a voicemail message for Ms. Tucker at her home stating that it had approved her Employee Profile, a fact that Ms. Tucker confirmed the next day with Employee Services. On April 18, 2001, she sent BMS the memorandum stating that she was resigning with two weeks notice. On or about April 23, 2001, Ms. Tucker told Johnson that Merck had approved her employment and that she had resigned from BMS on April 18, 2001. Johnson testified that he did not know Ms. Tucker still had been employed at BMS, and that had he known, he would not have allowed her to attend Merck's employee training program.

Merck learned of Ms. Tucker's dual employment in April 2001 from a confidential source.[2] Merck's subsequent investigation revealed that Ms. Tucker was listed as a current employee of both Merck and BMS. It also learned from BMS that she still possessed BMS property, including a car parked at her home. Moreover, Merck learned that as of April 16, 2001, Ms. Tucker still was acting in a managerial capacity at BMS by participating in teleconferences and submitting expenses for reimbursement.

Merck then interviewed Ms. Tucker, at which time she told Merck that she had resigned from BMS on February 20, 2001. She admitted that she had received paychecks from BMS for periods following that date, but claimed that she tried to notify BMS of this error and that she planned to return the money. She further claimed that other than

_____

[2]The information from this source appears to have been independent of what Johnson learned from Ms. Tucker.

4

those compensation-related conversations, she had had no contact with BMS. As we have indicated both BMS and Merck fired Ms. Tucker on April 25, 2001.

B. Ms. Tucker's Work Activity at Merck

The following compilation summarizes Ms. Tucker's work activity at Merck between March 1, 2001, and April 18, 2001.

- On March 2, 2001, Ms. Tucker met with Johnson for an hour at Merck's East Brunswick facility.

- In March 2001, Ms. Tucker attended a multi-day Executive Team Meeting at a hotel in Pennsylvania at which business and human resource presentations were made.

- From March 5-9, 2001, Ms. Tucker attended New Manager Merck Training. According to Merck, the meeting contained confidential information, including tactical plans, strategic approaches to positioning products, and product messages. Ms. Tucker denies that Merck's products and strategies were discussed.

- In March 2001, Merck listed Ms. Tucker on the roster of employees who reported to Johnson. Ms. Tucker contends that the list was merely one of "proposed" employees, but Johnson explained that these employees actually were hired, and that the word "proposed" meant only that there "still would be some movement of personnel." SA. 192.

- Prior to April 17, 2001, Merck issued Ms. Tucker a rental car. She claims that she used it merely to search for a home in connection with her proposed relocation to New Jersey.

- Prior to April 18, 2001, Merck issued Ms. Tucker a corporate credit card, which she used on March 21-26, 2001, and April 2-16, 2001.

- In March 2001, Merck issued Ms. Tucker a laptop computer, which she used to send and receive emails to other Merck employees for business-

5

related matters.

- On April 9, 2001, Ms. Tucker exercised managerial authority by sending an email to a Merck employee who failed to attend a training program. This email stated in relevant part as follows:

  > As we discussed during our meeting on Thursday afternoon, [your actions] outlined above are a deviation from expectations. It is my expectation and the expectations of Merck that you immediately make your trainers and me aware of any conflict in your schedule that interferes with your attendance to the training program. This is your responsibility. If this behavior continues, further disciplinary action may result up to and including termination.

  SA. 245. Ms. Tucker copied numerous Merck managers and human relations personnel on this email; none of them challenged her authority to send it.

- On April 6, 2001, Ms. Tucker submitted a reimbursement request for expenses incurred in March 2001, including the cost of a cellular phone. Merck reimbursed her via a check. In May 2001, she requested reimbursement for April expenses and March cellular phone charges.

- In March 2001, Ms. Tucker received an "advanced relocation check" for $5,885.94 from Merck, which she deposited on April 2, 2001.

- On April 25, 2001, she received payroll checks for work retroactive to March 1, 2001, which she deposited. She also received a payroll check from Merck in May 2001 for wages earned in April 2001, which she deposited.

- On April 30, 2001, Ms. Tucker wrote a check to Merck for $10,776.24, in an attempt to return "the entire amount of [her] net pay for the months of March 2001 and April 2001." Merck never cashed her check. SA. 206-09.

## C. Mr. Tucker

Merck had employed Troy Tucker, Ms. Tucker's husband, since September 1989,

when it hired him as a biotechnician. In the summer of 2000, he became a contract analyst. Randall Mattison ("Mattison") was his direct supervisor from then until July 2002 and Reagan Hull ("Hull") was Mattison's supervisor.

D. Merck's Conflict of Interest Policy

Merck has a conflict of interest policy that is "intended to guide all directors, officers and employees when engaging in activities outside the Company in which a conflict with Company interest may potentially, or in fact, exist." SA. 361. It requires employees to report any outside activities in which they, or their immediate family members – including their spouses – are engaged that may conflict with Merck's interests. Merck's management determines whether conflicts exist and how Merck should deal with them.

The policy makes clear that employment with an enterprise or organization that competes with Merck is a conflict of interest. Mr. Tucker concedes that BMS is a direct competitor of Merck in the pharmaceutical industry. Thus, so long as he was aware of his wife's alleged dual employment, he had a potential conflict of interest.

E. Mr. Tucker's Awareness of His Wife's Dual Employment

On April 12, 2001, an anonymous caller told Merck's Advice Line that both Merck and BMS employed Ms. Tucker.[3] On April 16, 2001, Merck's Office of Ethics referred

[3]The Advice Line is a toll free number established by Merck for individuals to raise
(continued...)

7

this report to Maxine Miller ("Miller"), an associate ethics officer at the Ombudsman's Office. Miller then contacted Merck's security department, which determined that Ms. Tucker in fact was maintaining dual employment.

On April 25, 2001, Jack Scott ("Scott") of Merck's security department contacted Hull and informed him that Merck had fired Ms. Tucker on the grounds of her dual employment. Scott relayed this information so that Hull would understand if Mr. Tucker needed to leave work early that day.

On May 16, 2001, the same anonymous caller told Merck's Advice Line that Mr. Tucker was "aware of the conflict of interest involving his wife." SA. 457. When Miller received this report, she contacted Mr. Tucker.

Miller met with Mr. Tucker on June 1, 2001, for about 25 minutes. She informed him of the allegation against him, and asked him, inter alia, the following questions: (1) are you aware of anything that your wife does?; (2) You live in your house. You have to know what your wife is doing on a daily basis. (3) Are you aware of your wife's situation?; and (4) Do you and your wife reside at the same residence? Miller then gave him a copy of Merck's conflict of interest policy and asked him to review it. After he reviewed it, she asked him again if he was aware of his wife's conflict of interest. He responded that he wanted additional time to consider the question. The two agreed to get

---

(...continued)
questions or issues regarding Merck or its employees.

in touch by June 6, 2001.

On June 19, 2001, Miller's secretary left Mr. Tucker a voicemail message asking him to schedule a meeting with Miller. The next day, Mr. Tucker contacted Miller and she asked him again whether he was aware of his wife's conflict of interest. He responded that he needed to see a copy of the allegation made against him. The two arranged to meet on July 10, 2001.

On July 10, 2001, Miller provided Mr. Tucker with a copy of the allegation. After reviewing it, Mr. Tucker read a prepared statement in which he denied knowledge of the allegation. He also mentioned that his manager, Mattison, knew he was meeting with a member of the Ombudsman's office.

On July 18, 2001, Miller met with Mattison for approximately 45 minutes to discuss the allegation against Mr. Tucker. She asked Mattison to review Merck's conflict of interest policy with Mr. Tucker and to document that the conversation took place. On July 19, 2001, Mattison met with Mr. Tucker and reviewed Merck's conflict of interest policy with him. On July 23, 2001, Mattison drafted a memo to file memorializing his conversations with Ms. Miller and Mr. Tucker.

On August 7, 2001, Miller met with Mattison's supervisor, Hull. She informed Hull of the allegations against Mr. Tucker and that Mr. Tucker had denied knowledge of his wife's dual employment. Miller told Hull that she had asked Mattison to review

9

Merck's conflict of interest policy with Mr. Tucker. She then asked Hull to verify that Mattison had done so.

Hull met with Mattison on August 7, 2001, and confirmed these facts. He expressed concern to Mattison that the file letter he drafted was a "get out of jail free card," meaning that Mr. Tucker would not be subject to "punishment, penalty or reprisal," SA. 461, and that the letter could be used against Merck in the future. Thus, Miller asked Hull to have the letter worded more strongly. Hull then told Mattison that Miller wanted the letter to be worded more strongly. Mattison later relayed these remarks to Mr. Tucker.

## II. DISCUSSION

A. <u>Standard of Review and Standard for Summary Judgment</u>

We exercise <u>de novo</u> review of the district court's grant of summary judgment. <u>See</u> <u>Kneipp v. Tedder</u>, 95 F.3d 1199, 1204 (3d Cir. 1996); <u>Mark v. Borough of Hatboro</u>, 51 F.3d 1137, 1141 (3d Cir. 1995). Summary judgment is proper when the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In reviewing the record, we are required to view the inferences to be drawn from the underlying facts in the light most favorable to the Tuckers, as the parties opposing the motion, and to take their

10

allegations as true when supported by proper proofs whenever these allegations conflict with those of Merck. See Meritcare Inc. v. St. Paul Mercury Ins. Co., 166 F.3d 214, 223 (3d Cir. 1999). We review for abuse of discretion the Tuckers' claim that the district court prematurely granted summary judgment when it denied their motion to allow additional discovery under Fed. R. Civ. P. 56(f). See Pastore v. Bell Tel. Co. of Pa., 24 F.3d 508, 510 (3d Cir. 1994).

B. Defamation

　　　　Under Pennsylvania law, which is applicable in this diversity of citizenship case, a plaintiff seeking to recover for defamation bears the burden of proving: (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a conditionally privileged occasion. 42 Pa. Cons. Stat. Ann. § 8343(a) (West 1998).

1. Truth

Truth is an affirmative defense to a claim of defamation. Id. The defense is met so long as the defendant proves the statement to be substantially true. See Chicarella v. Passant, 494 A.2d 1109, 1115 n.5 (Pa. Super. Ct. 1985).

2. Privilege

Privilege is another defense to a claim of defamation. A conditional privilege attaches to communications "made on a proper occasion, from a proper motive, and in a proper manner," Maier v. Maretti, 671 A.2d 701, 706 (Pa. Super. Ct. 1995), whenever "circumstances are such as to lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that facts exist which another sharing such common interest is entitled to know." Id. The conditional privilege is abused, however, and thus the defense is rendered inapplicable, when publication (1) is actuated by malice or negligence; (2) is made for a purpose other than that for which the privilege is given; (3) is made to a person not reasonably believed to be necessary for the accomplishment of the purpose of the privilege; or (4) includes defamatory matter not reasonably believed to be necessary for the accomplishment of the purpose. See Elia v. Erie Ins. Exch., 634 A.2d 657, 661 (Pa. Super. Ct. 1993).

3. Ms. Tucker's Defamation Claim

Ms. Tucker alleges that several Merck employees defamed her by communicating to BMS employees and third parties that BMS and Merck employed her simultaneously. Merck defends against this claim by arguing that in fact both companies employed her from March 1, 2001, until April 18, 2001.

The parties agree that the standard for determining whether a person is an employee is a flexible one in which the court considers a totality of factors. See, e.g.,

12

<u>Oshiver v. Levin, Fishbein, Sedran & Berman</u>, 910 F. Supp. 225, 227 (E.D. Pa. 1996),

<u>aff'd</u>, 96 F.3d 1434 (3d Cir. 1996) (table). The analysis places the "greatest emphasis on

the hiring party's right to control the manner and means by which the work is

accomplished." <u>Poff v. Prudential Ins. Co.</u>, 882 F. Supp. 1534, 1536 (E.D. Pa. 1995)

(citation omitted). In this case, the district court weighed the following factors as

determinative of an employer-employee relationship: (1) the right to select and discharge

an employee; (2) the payment of wages; (3) whether taxes were deducted from the

individual's pay; (4) whether the employer supplied tools and equipment necessary to

carry out the services; (5) whether the individual received any employer-supplied training;

(6) whether the employer received any economic benefit as a result of the individual's

efforts; and (7) whether the individual did work on the employer's premises. We agree

that these factors provide an appropriate framework in which to analyze Ms. Tucker's

status at Merck.

　　Applying these factors, we concur with the district court that, as a matter of law,

Ms. Tucker was a Merck employee during the relevant time period. In March 2001, Ms.

Tucker spent five days in employee-only training for management. On March 9, 2001,

Merck officially assigned Johnson as her manager. Merck then gave Ms. Tucker a laptop

computer and email account, both of which she used to conduct Merck business. She also

accepted a relocation stipend from Merck, even though she had not moved her residence.

13

Likewise, Merck paid for her travel expenses, including a rental car and toll and gas expenditures. Merck also gave her a corporate credit card, which she used prior to April 18, 2001, and was reimbursed.

Furthermore, Ms. Tucker presented herself as a manager at Merck, and in one instance, emailed a Merck employee to reprimand him for failing to comply with Merck's rules and policies. This email was copied to several Merck managers and human resources personnel none of whom challenged her authority to send it. Ms. Tucker also accepted payment from Merck for work performed there between March 1, 2001, and April 18, 2001. Although she later sought to return the money via personal check, her initial acceptance indicates a mutual understanding of employment.

Thus, inasmuch as Ms. Tucker did not notify BMS that she was resigning until April 18, 2001, the evidence is conclusive that she maintained dual employment at BMS and Merck from March 1, 2001, through April 18, 2001. Accordingly, any communications by Merck stating that she was employed dually cannot be defamatory because they are true.[4]

4. Mr. Tucker's Defamation Claim

Mr. Tucker alleges that each of the following statements by Merck employees

---

[4]Because the court appropriately granted summary judgment against the defamation claim on the basis of truth, we need not address whether the allegedly defamatory statements also were privileged.

constituted defamation: (1) the letter Mattison entered into Ms. Tucker's file[5]; (2) Hull's statement to Mattison that the letter was a "get out of jail free card"; (3) Miller's statement to Mattison that it was "kind of hard to believe that Mr. Tucker would not know everything about his wife, her whereabouts and what she does"; and (4) Miller's statement to Hull that she wanted the letter to be more strongly worded. Merck argues that these statements were privileged, lacked defamatory meaning, or were otherwise true or opinions.

As discussed below, we hold, as the district court did, that each of these statements is privileged because each was made within the context of an employer conducting an internal investigation into an employee. See, e.g., Maier, 671 A.2d at 706 (supervisor's

---

[5]Mattison's file letter reads as follows:

On July 18, 2001, I met with Maxine Miller in the Office of Ethics department of Merck & Co., Inc. In the meeting I was informed by Ms. Miller that an anonymous party submitted an unsubstantiated allegation of conflict of interest against Troy Tucker.

After discussing the chain of events with Ms. Miller she informed me that Troy Tucker denied the allegation and subsequent to Mr. Tucker[']s denial the Office of Ethics has closed the file.

On the morning of July 19, 2001 I spoke to Mr. Tucker and informed him that I met with Ms. Miller regarding the unsubstantiated allegation and that the issue is considered closed with no further investigation pending and without punishment, penalty or reprisal.

SA. 461.

communication to employees with common interest in the information was privileged).

### a. The File Letter

The contents of Mr. Tucker's file letter are entitled to an absolute privilege. See Agriss v. Roadway Express, Inc., 483 A.2d 456, 463 (Pa. Super. Ct. 1984) (noting that one who publishes defamatory matter within the scope of an absolute privilege is immune from liability regardless of occasion or motive). In Agriss, the court held that the absolute privilege pertains to warning letters as well as notices of dismissal. See id. at 464. Furthermore, "[t]he copy of the warning letter sent to [plaintiff's] employee personnel file also was covered by the privilege." Id.

### b. Hull's "Get out of Jail Free Card" Statement

Next, Hull's statement to Mattison that the file letter was a "get out of jail free card" is entitled to a conditional privilege. This statement was made by a Merck supervisor to his subordinate regarding an employment issue. As Hull explained, he believed this letter could be used against Merck in the future. Thus, Hull shared a common interest with Mattison in the subject matter and Mattison was entitled to know what Hull had to say about it. See, e.g., Daywalt v. Montgomery Hosp., 573 A.2d 1116, 1118 (Pa. Super. Ct. 1990) ("A publication is conditionally privileged if the publisher reasonably believes that the recipient shares a common interest in the subject matter and is entitled to know.") (citation omitted).

16

c. Miller's Statements

Finally, the two statements by Miller are also entitled to a conditional privilege. Having investigated Mr Tucker's conflict of interest, Miller was entitled to give other Merck employees investigating the matter her opinion as to the underlying facts and to its proper resolution.

For these reasons, the district court acted properly in granting summary judgment against Mr. Tucker's defamation claim.[6]

C. Invasion of Privacy

We also hold that the district court properly dismissed Mr. Tucker's claim that Merck invaded his privacy. There are four types of invasion of privacy in Pennsylvania: (1) publicity given to private life; (2) intrusion upon seclusion; (3) appropriation of name or likeness; and (4) publicity placing a person in a false light. See Vogel v. W.T. Grant Co., 327 A.2d 133, 136 (Pa. 1974). At issue here is the intrusion upon seclusion claim. To maintain such a claim, a plaintiff must show that (1) there was an intentional intrusion; (2) upon the solitude or seclusion of the plaintiff, or his private affairs or concerns; and (3) that the intrusion was substantial; and (4) highly offensive. See Larsen v. Philadelphia Newspapers, Inc., 543 A.2d 1181, 1186-87 (Pa. Super. Ct. 1988).

Mr. Tucker complains that Miller's questions regarded the "intimate details" of his

---

[6]Because the allegedly defamatory statements are privileged, we need not address the district court's ruling that the first two statements are not capable of defamatory meaning.

17

home and married life, and therefore intruded upon his seclusion. Specifically, he complains of these four statements: (1) are you aware of anything that your wife does?; (2) You live in your house. You have to know what your wife is doing on a daily basis; (3) Are you aware of your wife's situation?; and (4) Do you and your wife reside at the same residence?

Miller made these statements while trying to determine whether Mr. Tucker had a conflict of interest due to his awareness of his wife's dual employment. Thus, no rational jury could find these questions to have been highly offensive, a threshold requirement of a claim for intrusion upon seclusion. Therefore, the district court properly granted summary judgment on Mr. Tucker's invasion of privacy claim.

D. The Tuckers' Discovery Motion

Finally, the Tuckers appeal the denial of their Rule 56(f) motion, filed on March 19, 2003, which requested that "the Court defer adjudicating defendant's Motion for Summary Judgment until such time as the heads of defendant's Employee Services, Employee Benefits and Payroll departments are produced for deposition and the parties have an opportunity to submit supplemental memoranda regarding that testimony." A 113. Apparently, they sought these depositions in order to support Ms. Tucker's claim that she could not have been hired at Merck until her Employee Profile was approved. However, as discussed above, the evidence was overwhelming that she was an employee

18

of Merck during the relevant time period, regardless of when her Employee Profile was approved. Thus, Ms. Tucker has failed to show how the information sought if obtained would have precluded the grant of summary judgment in Merck's favor. See Dowling v. City of Philadelphia, 855 F.2d 136, 139-40 (3d Cir. 1998) ("This court has interpreted Rule 56(f) as imposing a requirement that a party seeking further discovery in response to a summary judgment motion submit an affidavit specifying, for example, what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained.") (citation omitted). As to Mr. Tucker's claims, the requested information bears no relevance. Thus, we conclude that the district court exercised appropriate discretion in denying the Tuckers' Rule 56(f) motion.

## III. CONCLUSION

For the reasons stated above, we affirm the district court's grant of summary judgment entered on May 2, 2003, in favor of Merck.

19