**Nolan O. COX, Plaintiff,**

v.

**Darren GALAZIN, individually and in his official capacity, Dave Pyzewski, individually and in his official capacity, Stamford, Connecticut Area Local, American Postal Workers Union, AFL–CIO, and American Postal Workers Union, AFL–CIO, Defendants.**

**Civ. No. 3:03CV01140(AWT).**

United States District Court,
D. Connecticut.

Nov. 9, 2006.

Nolan O. Cox, Stamford, CT, Pro se.

Jeffrey G. Schwartz, Scott B. Clendaniel, Law Offices of Scott B. Clendaniel, Hartford, CT, for Defendants.

## RULING ON MOTION FOR SUMMARY JUDGMENT

THOMPSON, District Judge.

Nolan O. Cox ("Cox") filed this action against Darren Galazin ("Galazin"), Dave

Pyzewski ("Pyzewski"), the Stamford, Connecticut Area Local American Postal Workers Union, AFL–CIO ("Local 240"), and the American Postal Workers Union, AFL–CIO ("APWU") in a five-count Amended Complaint. The defendants have moved for summary judgment on all counts of the Amended Complaint. For the reasons set forth below, the defendants' Motion for Summary Judgment is being granted.

## I. FACTUAL BACKGROUND

Cox served as president of Local 240 for a period beginning in 1994 and ending in March 2002. Cox retired on disability from the Postal Service in March 2002.[1] After Cox's retirement, Galazin succeeded him as president of Local 240.

In January 2001, the Department of Labor ("DOL") performed an audit of Local 240. In a letter dated March 8, 2001, investigator Kerry McEntee summarized for Cox the areas the DOL had identified as requiring "corrective action." (Memorandum in Opposition to Defendants Motion for Summary Judgment (Doc. No. 104) ("Plaintiff's Opposition"), Ex. 6). The letter also advised Cox that the compliance audit performed by the DOL was "not intended as a complete audit of all areas of your union's financial activities and operations." *Id.*

Subsequently, Galazin requested that the APWU perform an audit of Local 240. Robert Tunstall, Secretary–Treasurer of the APWU, assigned Pyzewski to conduct the audit. Pyzewski performed an audit of Local 240 from June 2, 2002 to June 8, 2002. As part of his audit, Pyzewski visited People's Bank where Local 240 maintained two checking accounts. One account was a new account that Pyzewski had advised Galazin to open.

Pyzewski also spoke to McEntee about McEntee's audit of Local 240. McEntee informed Pyzewski that Ed Olwell, former treasurer of Local 240, had told him on April 28, 2002 that the issues that McEntee had identified in his letter had been corrected. However, McEntee told Pyzewski that Olwell's statement was untrue and that he had subsequently spoken to Galazin. McEntee told Pyzewski that he intended to re-audit Local 240; however, after discussions with Pyzewski, McEntee informed Pyzewski that he no longer planned to perform the additional audit.

As part of his audit, Pyzewski also spoke to a representative of Cingular Wireless ("Cingular") regarding billing for a cell phone used by Cox and paid for by Local 240. Galazin sent a fax to Cingular on May 3, 2002 asking that the cell phone service be terminated. However, according to the company representative, Cox then called Cingular to request that service be reinstated, stating that he had found his lost cell phone. Cox also requested that Cingular put him on "follow me roaming" which would allow him to utilize the cell phone within a larger service area. Cingular resumed service for Cox's cell phone. Pyzewski stated in his audit report that Cingular agreed to terminate the service and to seek payment from Cox directly. Pyzewski also stated in his audit report that the social security number appearing on the Cingular account did not match that of anyone on Local 240's payroll. In reviewing bills for the year 2001 for the cell phone, Pyzewski discover-

---

1. The defendants' statement of facts asserts that Cox retired in March 2002. The plaintiff testified that he retired "In April—in March of 2002 from the postal service." (Cox Dep. at 14). These statements do not appear to be inconsistent. However, Pyzewski's audit states that Cox did not retire until April 2002. The precise date of Cox's retirement is not material to the court's analysis, and the court adopts the plaintiff's version of the facts for purposes of this motion.

ed over $2,000 in charges and also learned that between one-third and one-half of the calls made were personal calls. Pyzewski included all of the above information in his audit report.

Pyzewski also discussed Cox's personal financial issues in his audit report. Pyzewski stated that a court had ordered that Cox have child support payments withheld and also stated that he had not paid taxes and the matter was pursued in court. Furthermore, Pyzewski stated that Cox had filed for bankruptcy in March 2002 and was granted relief in April 2002. McEntee informed Pyzewski that Cox had declared bankruptcy and had listed among his debts money he owed Local 240. Pyzewski stated in his audit report that he spoke with Richard Coan, the bankruptcy trustee, who informed him that relief had been granted as to all creditors. In addition, Pyzewski stated that, in Cox's filings with the bankruptcy court, he listed Local 240 as a creditor to which he owed approximately $18,300 but did not list as an asset the leave payments he was seeking from Local 240.[2]

Pyzewski also stated that he had found a check paid to Attorney Eileen Seamon for legal fees and determined that it was used to pay for personal legal services for Cox, not representation of Local 240.

From cell phone records, Pyzewski determined that Cox was on administrative leave for almost five weeks before he left office; this leave time was not documented in payroll records. In his audit report, Pyzewski also identified other time periods where cell phone records indicated that Cox was in North Carolina. Pyzewski concluded in his audit report that Cox had been overpaid for administrative leave,

rather than underpaid. In addition, Pyzewski stated that McEntee had informed him that he agreed that Cox should not receive the leave payments.

In the audit report, Pyzewski also noted that Local 240 had improperly paid Cox's health care premiums after an amendment was passed in July 2000 forbidding such payments.

On June 9, 2002, at the request of Galazin, Pyzewski presented a report at a general membership meeting. Pyzewski also sent a copy of the final audit report to Tunstall, along with a cover letter dated June 20, 2002; Pyzewski believes that he and Tunstall had a brief discussion about bringing Local 240 into compliance with labor laws. Pyzewski also sent the final audit report to Galazin.

In approximately July 2002, Galazin told Edith Police that Cox "used union money to pay for [his] private attorney." (Cox Dep. at 19).

In a letter dated October 29, 2002, Galazin responded to requests for information from David LaRosa, Wage Enforcement Agent at the Connecticut Department of Labor. Galazin stated in the letter that Cox had been overpaid for leave, not underpaid, and cited to McEntee's letter and Pyzewski's audit. Galazin stated, "it is the intent of this Local to adhere to our National Auditor's direction that Mr. Cox IS NOT owed any further payment, that in fact, he OWED this Local a considerable amount of money that he was overpaid." (Plaintiff's Opposition, Ex. 7). Further, Galazin informed LaRosa that "due to the misappropriation of funds and duties of Mr. Cox and other Officers of his administration," Local 240 has invoked its liability bond held by Zurich North America. *Id.*

---

**2.** The court notes that the plaintiff, pointing to Exhibits 13–A and 13–B, asserts that this statement is untrue. However, these documents do not support the plaintiff's contention, as they only state that Local 240 owes

wages to the debtor "at any given time" and do not provide an amount. (Plaintiff's Opposition, Exs. 13–A, 13–B). Neither exhibit refers to the fact that the claimed wages are for leave time.

To support Local 240's claims under a bond issued by Fidelity and Deposit Company of Maryland to cover Cox while he served as president of Local 240, Galazin submitted numerous proof of loss forms. On a form dated October 23, 2002, Galazin represented that Local 240 had lost $25,000 due to "failure of fiduciary responsibility entrusted to Cox." (Plaintiff's Opposition, Ex. 1). Galazin submitted a form dated March 19, 2003 and cited the same amount and reason for the loss. *(See* Plaintiff's Opposition, Ex. 4–A). Galazin submitted another form dated March 19, 2003 which provided identical information. *(See* Plaintiff's Opposition, Ex. 8–C). Galazin's July 1, 2002 form sought recovery in the amount of $25,000 based on "failure of Nolan O. Cox and Ed Olwell to discharge faithfully [their] duties . . . ." (Plaintiff's Opposition, Ex. 8).

In a letter dated March 18, 2003, Galazin provided information pertaining to the bond claim to a Zurich North America representative. Galazin stated that Local 240 had total debt of $24,672.72; Galazin referred to "the [d]ebts, and unpaid bills left to the current Local President and Executive Board, by the former President Nolan Cox, and Treasurer Ed Olwell." (Plaintiff's Opposition, Ex. 9). In addition, Galazin stated that Cox was also responsible for unauthorized use of union funds for personal transportation ($1,541.07); unauthorized child support payments ($11,520); payments on vouchers which were unauthorized or did not bear appropriate signatures ($9,675.55); payment for Cox's personal legal issues ($150.00)[3]; and payment for Cox's portion of retirement costs ($15,-200.62).

In a letter to a Zurich North America representative dated May 6, 2004, Galazin

discussed the bankruptcy proceedings against Cox, during which Cox acknowledged that he owed Local 240 the sum of $18,300. Galazin also stated that in the bankruptcy proceeding, Cox had not listed unpaid leave as an asset and that now Cox was attempting to sue Local 240 for unpaid leave. Galazin also apprised the representative of McEntee's concerns about "NUMEROUS questionable practices for the local while Mr. Cox and Mr. Olwell were President and Treasurer, respectively." (Plaintiff's Opposition, Ex. 8–B). In particular, Galazin pointed to Local 240's payment of Cox's retirement benefits and "money charged off to the Local, as well as other irregularities." *Id.* In this letter, Galazin also informed the representative that Local 240 was modifying its claim to ask for only $18,300 because "we just do not have the time or resources to pursue the long and costly process of documenting [the] amount that we KNOW Mr. Cox owes the Local." *Id.* On another proof of loss form dated June 10, 2004, Galazin asserted a claim for $18,300.00 based on losses sustained "when the local paid for the then president, Nolan O. Cox's retirement benefits that should have been paid for solely by Mr. Cox." (Plaintiff's Opposition, Ex. 1).

## II. LEGAL STANDARD

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs.,* 22 F.3d

---

3. The plaintiff produced a copy of the check to Attorney Eileen Seaman, which both Cox and Galazin signed. He also produced a letter from Attorney Seamon to him which re- flects that the legal services related to garnishment by the Department of Revenue Services' of Cox's wages. *(See* Plaintiff's Opposition, Ex. 12).

1219, 1223 (2d Cir.1994). Rule 56(c) "mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *See Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548.

When ruling on a motion for summary judgment, the court must respect the province of the jury. The court, therefore, may not try issues of fact. *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Donahue v. Windsor Locks Board of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir. 1987); *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1319–20 (2d Cir. 1975). It is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined ... to issue-finding; it does not extend to issue-resolution." *Gallo*, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is *both* genuine *and* related to a material fact. Therefore, the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. As the Court observed in *Anderson:*

"[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Id.* at 248, 106 S.Ct. 2505. Thus, only those facts that *must* be decided in order to resolve a claim or defense will prevent summary judgment from being granted. When confronted with an asserted factual dispute, the court must examine the elements of the claims and defenses at issue on the motion to determine whether a resolution of that dispute could affect the disposition of any of those claims or defenses. Immaterial or minor facts will not prevent summary judgment. *See Howard v. Gleason Corp.*, 901 F.2d 1154, 1159 (2d Cir.1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and ... draw all reasonable inferences in its favor." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir.2000)(quoting *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 177 (2d Cir.1990)). Because credibility is not an issue on summary judgment, the nonmovant's evidence must be accepted as true for purposes of the motion. Nonetheless, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment. *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 315 (2d Cir.1997) (quoting *W. World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990)). Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" will be insufficient; there must be evidence on which a jury could "reasonably find" for the nonmovant. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

Finally, the nonmoving party cannot simply rest on the allegations in its pleadings since the essence of summary judg-

ment is to go beyond the pleadings to determine if a genuine issue of material fact exists. *See Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact," *Weinstock*, 224 F.3d at 41, if the movant demonstrates an absence of such issues, a limited burden of production shifts to the nonmovant, which must "demonstrate more than some metaphysical doubt as to the material facts, . . . [and] must come forward with specific facts showing that there is a genuine issue for trial." *Aslanidis v. United States Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir.1993)(quotation marks, citations and emphasis omitted). Furthermore, "unsupported allegations do not create a material issue of fact." *Weinstock*, 224 F.3d at 41. If the nonmovant fails to meet this burden, summary judgment should be granted. The question then becomes whether there is sufficient evidence to reasonably expect that a jury could return a verdict in favor of the nonmoving party. *See Anderson*, 477 U.S. at 248, 251, 106 S.Ct. 2505.

Because the plaintiff in this case is proceeding *pro se*, the court must read the plaintiff's pleadings and other memoranda liberally and construe them in a manner most favorable to the plaintiff. *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). Moreover, because the process of summary judgment is "not obvious to a layman," *Vital v. Interfaith Medical Ctr.*, 168 F.3d 615, 620 (2d Cir.1999), the district court must ensure that a *pro se* plaintiff understands the nature, consequences and obligations of summary judgment. *See id.* at 620–621. Thus, the district court may itself notify the *pro se* plaintiff as to the nature of summary judgment; the court may find that the opposing party's memoranda in support of summary judgment provide adequate notice; or the court may determine, based on thorough review of the record, that the *pro se* plaintiff understands the nature of summary judgment. *See id.* After reviewing the record, the court concludes that the plaintiff understands the nature, consequences and obligations of summary judgment. First, the defendants filed a Local Rule 56 Notice to Pro Se Litigant (Doc. No. 98), which adequately apprised the plaintiff of his obligations at the summary judgment stage. That document detailed what the plaintiff was required to do, in terms of making arguments and submitting documentation, to defeat the motion for summary judgment. Second, the plaintiff's submissions indicate that he understands summary judgment, but simply does not have evidence to withstand it. The plaintiff attempts to show that there exist genuine issues of material fact, but there simply are none. The court therefore concludes that the *pro se* plaintiff in this case understands the nature, consequences and obligations of summary judgment.

## III. DISCUSSION

### A. Plaintiff is Required to Produce Evidence of "Actual Malice"

 The plaintiff argues that the statements made by Pyzewski and Galazin constitute defamation per se, and that consequently, he does not need to show "actual malice" in order to recover. (*See* Plaintiff's Opposition, at 9). Even assuming that some of the statements could be categorized as defamation per se,[4] this has no bearing on the requirement that a plaintiff

---

4. In *Battista v. United Illuminating Co.*, the court explained that libel per se applies to "(1) libels charging crimes and (2) libels which injure a man in his profession and calling." 10 Conn.App. 486, 492, 523 A.2d

1356 (1987). For the first category, the defamatory statement must charge a crime which is "a chargeable offense which is punishable by imprisonment." *Id.* at 493, 523 A.2d 1356. "The allegation that a person

show malice in certain situations. Rather, where statements constitute defamation per se, "the plaintiff need not plead or prove injury to [his] reputation; it is presumed." *Morgan v. Bubar*, No. 56555, 2006 WL 1828465, at *4 (Conn.Super. Ct. June 15, 2006); *see DeVito v. Schwartz*, 66 Conn.App. 228, 235, 784 A.2d 376 (2001) (where "defamatory words are actionable per se, the law conclusively presumes the existence of injury to the plaintiff's reputation."); *Miles v. Perry*, 11 Conn.App. 584, 602, 529 A.2d 199 (1987) (when plaintiff establishes "that the words are false and actionable per se ... [he] is entitled under Connecticut law to recover general damages without proof of special damages," which are "actual pecuniary loss suffered").

▮ If the plaintiff were a private individual and the statements concerned a purely private matter, the plaintiff would not need to show actual malice in order to establish liability. Further, in such a situation, if the statements constituted defa-

mation per se, the plaintiff would also not need to prove actual injury and could recover presumed general damages. *See, e.g., El–Hadad v. Embassy of United Arab Emirates*, No. Civ.A. 96–1943(RWR), 2006 WL 826098, at *15 (D.D.C. Mar. 29, 2006) ("[w]here a plaintiff is neither a public official nor a public figure, and where the defamatory statements involve no issue of general public importance, proof of defamation *per se* entitles the injured party to presumed general damages...."). However, the court in *El–Hadad* noted that cases where the plaintiff is a private individual and the statements do not concern "a matter of general public interest" should be distinguished from cases implicating "heightened First Amendment concerns" where a public figure or statements of a general public interest are involved. 2006 WL 826098, at *15.

▮ Here, the plaintiff must show "actual malice" because he is a limited public figure; alternatively, because the defendants are entitled to qualified privilege[5]

committed a crime need not be as specific as in the indictment, but it must bear some reasonable relation to the legislative definition of a crime." *Id.* at 493, 523 A.2d 1356. *See, e.g., Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 234 Conn. 1, 35, 662 A.2d 89 (1995) (statements falsely charging "improper conduct and lack of integrity in the performance of [plaintiff's] professional duties", the purpose of which "had been to effectuate the plaintiff's discharge", were defamation per se); *Gambardella v. Apple Health Care, Inc.*, 86 Conn.App. 842, 848, 863 A.2d 735 (2005) (disciplinary action report stating that plaintiff had committed "theft" is defamation per se); *Rom v. Fairfield University*, No. CV020391512S, 2006 WL 390454, at *3 (Conn.Super.Ct. Jan. 30, 2006) (statement charging the plaintiff with vandalism can constitute defamation per se because it can be considered "criminal activity"); *Kuselias v. Southern New England Telephone Co.*, No. CV 910322295S, 1996 WL 646759, at *9 (Conn.Super.Ct. Oct. 28, 1996) (statement that plaintiff "misused SNET funds for personal trips to Hawaii and Toronto" effectively charged theft and was actionable per se).

5. Where defendants are entitled to a qualified or conditional privilege, "[p]roof of defamation *per se* ... frees a plaintiff only from the burden of proving damages; it does not supply proof of actual malice for purposes of establishing liability." *Johnson v. Holway*, No. Civ.A.03–2513 ESH, 2005 WL 3307296, at *28 (D.D.C. Dec. 6, 2005); *see Malone v. Des Moines Area Community College*, No. 4:04–CV–40103, 2005 WL 290008, at *10 (S.D.Iowa Jan. 26, 2005) ("If the Court establishes defamation per se and Defendants are able to raise a qualified privilege, the burden shifts to Plaintiff to show actual malice."). Thus, in *Torosyan*, the Connecticut Supreme Court undertook a separate analysis of privilege, and then addressed defamation per se as only pertaining to damages. 234 Conn. at 35, 662 A.2d 89. *See also Gambardella v. Apple Health Care, Inc.*, No. CV000162660S, 2006 WL 2556300 (Conn.Super.Ct. Aug. 9, 2006) (statement constituted defamation per se and qualified privilege applied, but privilege was lost because statement was made with "actual malice").

for all statements with the possible exception of Galazin's statement to Police; and because the statements were published in the context of a labor dispute. Accordingly, even if the statements constitute defamation per se, Cox is not entitled to recover presumed general damages absent a showing of "actual malice."

### 1. Public Figure

 A public figure plaintiff "cannot recover unless he proves by clear and convincing evidence that the defendant published the defamatory statement with actual malice." *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 510, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991); *see Holbrook v. Casazza,* 204 Conn. 336, 342, 528 A.2d 774 (1987); *Miles,* 11 Conn.App. at 590, 529 A.2d 199 (where a plaintiff is a public figure, he must prove "actual malice" by clear and convincing evidence) [6].

 In determining whether an individual is a public figure, the court should examine "the nature and extent of [the] individual's participation in the particular controversy giving rise to the defamation." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 352, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). "Union officers are generally held to be public figures for purposes of union business where their activities place them in a controversy which invites scrutiny of their integrity, character, and professional ability." *Miles,* 11 Conn.App. at 592 n. 7, 529 A.2d 199; *see also Dunlop–McCullen v. Rogers,* No. 00 CIV.3274(JSR), 2002 WL 1205029, at *8 (S.D.N.Y. Feb. 21, 2002) (courts generally find "union members to be public figures for purposes of union business where their position is one of prominence or where their activities place them in a controversy that invites scrutiny"). In *Dunlop–McCullen,* the court

found that an elected president of a labor union with 4,000 members was a "public figure" because he had campaigned several times, participated in committees, controlled and appeared frequently in the union's newspaper, and regularly met with federal, state, and local officials on the union's behalf. *See also Miller v. Transamerican Press, Inc.,* 621 F.2d 721, 724 (5th Cir.1980) (where magazine published statement that plaintiff, Secretary–Treasurer of the International Brotherhood of Teamsters, had made a fraudulent loan, plaintiff was "a high-ranking official of a union of tremendous importance to our economy" and "as relates to his official duties is a public figure"); *Jesinger v. Nevada Federal Credit Union,* No. CV–S–90–195–HDM(LRL), 1992 WL 672236, at *2 (D.Nev. Mar. 27, 1992) (elected Nevada Federal Credit Union directors are public figures in their official capacities); *Henry v. Nat'l Ass'n of Air Traffic Specialists, Inc.,* 836 F.Supp. 1204, 1211 n. 6 (D.Md. 1993) *aff'd,* 34 F.3d 1066, 1994 WL 406550 (4th Cir.1994) (union officials were "public figures" "[g]iven their prominence as elected and appointed leaders of a 1700–member union"); *Argentine v. United Steel Workers Ass'n,* 23 F.Supp.2d 808, 820 (S.D.Ohio 1998) (plaintiffs were limited public figures because they were "chief union officers of a large local union which had recently experienced extended media coverage"). In *Argentine,* former union local officers sued union officials for defamation after the officials accused them of taking money from union funds.

 Cox, as president of Local 240, both enjoyed a position of prominence and engaged in activity which invited scrutiny by the membership. Also, as in *Argentine,* the statements which the plaintiff

---

**6.** Where a plaintiff is a private figure and the "actual malice" standard applies, the plaintiff need only prove "actual malice" by a preponderance of the evidence. *Id.* at 590, 529 A.2d 199.

alleges are defamatory all concern the plaintiff's actions performed in his capacity as president of Local 240. For these purposes, the plaintiff is a limited public figure. Thus, the plaintiff must prove "actual malice" in order to recover.[7]

### 2. Qualified Privilege

 Even if Cox were not a public figure, Cox would be required to show "actual malice" for all statements except for Galazin's statement to Edith Police because the defendants had a qualified privilege to speak.[8] To establish a qualified privilege defense, a defendant must prove five elements: "(1) an interest to be upheld, (2) a statement limited in scope to this purpose, (3) good faith, (4) a proper occasion, and (5) a publication in a proper manner to proper parties only." *Miles,* 11 Conn.App. at 595, 529 A.2d 199. "[A] conditional privilege may be recognized only where the statement is made in good faith, without malice, and in an honest belief in the truth of the statement, and in discharge of a public or private duty." *Muldoon v. Anderson,* No. CV990336964S, 2003 WL 951943, at *2 (Conn.Super.Ct. Feb. 24, 2003) (qualified privilege applicable where defendants communicated in accordance with policies in university student handbook).

 Privilege exists where "circumstances are such as to lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that facts exist which another sharing such common interest is entitled to know." *Maier v. Maretti,* 448 Pa.Super. 276, 671 A.2d 701, 706

(1995) (quoted in *Tucker v. Merck & Co., Inc.,* 102 Fed.Appx. 247, 253–54 (3d Cir. 2004)); *Torosyan,* 234 Conn. at 29, 662 A.2d 89 (communications between managers about the preparation of documents regarding employee's termination protected by qualified privilege, because such communications are "necessary to effectuate the interests of the employer in efficiently managing its business"); *Wheeler v. Miller,* 168 F.3d 241, 252 (5th Cir.1999) (qualified privilege applied where faculty members communicated to other faculty members and school district concerning student's qualifications for degree because communication was by people with an interest in the subject matter to "persons having a corresponding interest or duty"); *Roche v. Home Depot U.S.A.,* 197 Fed. Appx. 395, 2006 WL 2188708, at *5 (6th Cir.2006) (applying Kentucky law, qualified privilege is recognized "where the communication is one in which the party has an interest and it is made to another having a corresponding interest") (citations omitted); *Knox v. Neaton Auto Products Mfg., Inc.,* 375 F.3d 451, 460 (6th Cir.2004) (applying Ohio law, qualified privilege exists where publisher and recipient have a common interest and the "communication is of a kind reasonably calculated to protect or further it"); *Du-Bois v. Ass'n of Apartment Owners of 2987 Kalakaua,* 453 F.3d 1175, 1181 (9th Cir.2006) (statements made to officials in the course of a civil rights commission investigation, a police department investigation, and a court hearing were covered by qualified privilege as "[t]hey were made to officials whose duty it was to record them,

---

7. Also, the statements might constitute a matter of "public concern," requiring Cox to meet a heightened standard for liability in order to recover presumed damages. However, the court does not analyze this situation because it has concluded that Cox is a public figure for purposes of his union duties.

8. The court notes that while the defendants argue that they are entitled to absolute privilege, they fail to identify a federal law requiring Pyzewski's audit and have not otherwise demonstrated that they are shielded from liability by absolute privilege.

and published to people with an interest in the investigations and proceedings").

 Courts have repeatedly found that statements concerning labor union officials or employees are privileged when published in the proper context. "[T]here is no doubt that an officer of a union has a qualified privilege when he makes a statement informing the union of any supposed dereliction of duty of its officers," although such privilege can be overcome if the means of publication are not "reasonably adapted to the protection" of the "interest to one or both of the parties to the communication." *Blake v. Trainer*, 148 F.2d 10, 12 (D.C.Cir.1945). In *Sullivan v. Conway and Int'l Brotherhood of Electrical Workers*, the Seventh Circuit reasoned that if a board of directors could not discuss their opinions of candidates for positions, "the free and frank exchange of ideas, facts, and opinions bearing on professional competence [would] be inhibited." 157 F.3d 1092, 1098 (7th Cir.1998). The court found that, in an internal meeting, union officials could express honest opinions about an attorney's qualifications without fear of liability for defamation. *Id.* Furthermore, when it was announced to the local union membership that the plaintiff attorney and other business agents had been fired and that the local had been put in trusteeship because of problems which included corruption, the announcements were protected by privilege. *Id.* Even if the membership inferred that the attorney was fired in connection with the corruption, the statements were privileged because they were made to people "who had a vital interest in receiving candid communication from the trustee concerning his administration of the local." *Id.*

 Pyzewski's audit report, his report to the local membership, and any communications with union officials, the DOL, or other entities or individuals named in the audit are protected by qualified privilege

as defined in *Miles*. Pyzewski, whose duties included auditing local unions throughout the country, performed the audit after receiving the assignment from Tunstall. The audit was ordered because of McEntee's letter of inquiry, which included demands the union had failed to comply with. This fact demonstrates the interest of Local 240, the DOL, and the national APWU in Pyzewski's statements. Second, the statements in Pyzewski's audit report, in his report to Local 240 membership, and during his investigation were limited in scope to gaining an accurate assessment of Local 240's financial situation. Furthermore, Pyzewski undertook extensive research for his audit report; he examined documents and spoke to numerous individuals including Galazin, a Cingular representative, Local 240's bank, and a DOL official. The plaintiff has presented no evidence to show that Pyzewski, in relying on those sources, included information in his audit report or his report to Local 240 membership which was intentionally or recklessly false, or otherwise not conveyed in good faith. Rather, the evidence demonstrates that he acted in "good faith" in discharging his duty as an auditor. The evidence also shows that Pyzewski's statements were both made on a "proper occasion" and were published only to proper parties. Undeniably, when an audit has been ordered, an auditor's statements concerning his findings are published in an appropriate context when they appear in his audit report. The statements were also published to those with an interest in ascertaining the financial situation of Local 240 and the facts underlying its present position. Both the national APWU and Local 240 membership possessed a strong interest in ensuring the continued vitality and effectiveness of Local 240 in labor matters. Therefore, Pyzewski's publication was proper, and Pyzewski was entitled to qualified privilege.

All but possibly one of Galazin's statements are protected by qualified privilege. Galazin's statements in his letter to LaRosa were made in connection with a Connecticut DOL inquiry. Galazin, discharging his duties as president of Local 240, acted in the best interests of Local 240 in responding to LaRosa, who had an interest in receiving the communication as he was seeking to learn whether Cox should be paid for leave time. Galazin's statements to LaRosa were also limited in scope as he provided information concerning Cox's financial situation vis-a-vis Local 240, including the findings of Pyzewski. The evidence also supports the conclusion that Galazin acted in good faith, as he relied on Pyzewski's detailed report in making his statements. Galazin's statements to LaRosa were also made on a proper occasion and published in a proper context because Galazin's letter constituted Local 240's response to the DOL and was published to the inquiring DOL representative, the proper party to receive such a communication. Accordingly, Galazin is entitled to qualified privilege for these statements.

■ Similarly, Galazin's statements appearing in his bond claim forms and correspondence with a Zurich North America representative are protected by qualified privilege. In making a claim under the bond, Galazin acted in the best interests of Local 240 and communicated with an individual whose company would determine the grounds for the claim in deciding whether payment on the bond was warranted. Also, the evidence shows that Galazin's statements were limited in scope, as they concerned Local 240's financial position, and the facts contributing to its losses. To make a claim under the bond, it was necessary for Galazin to explain Cox's improper conduct. Therefore, the statements were both made on a proper occasion and published in a proper context. Furthermore, the evidence supports a conclusion that Galazin acted in good faith. The extensively researched audit report indicated gross mismanagement of Local 240 funds, and it was appropriate for Galazin to rely on the representations in the report.

However, with respect to Galazin's statement to Edith Police, the defendants have not demonstrated, on this record, that Galazin was protected by qualified privilege. The defendants have failed to explain the context of the statement or even show that Police is a union member with an interest in receiving the communication. But, as discussed above, the plaintiff must nonetheless show "actual malice" as to this statement because he is a limited public figure.

### 3. Labor Dispute

■ As the defendants argue, the "actual malice" standard also applies in this case because the statements were made in the context of a dispute concerning union business involving union members and officers. The Supreme Court has held that in "labor disputes,"[9] federal law preempts state defamation remedies. In *Linn v. United Plant Guard Workers of America, Local 114*, the Court adopted the *New York Times v. Sullivan* standard and held that state remedies for libel are not available in a labor union dispute except where "the defamatory statements were circulated with malice and caused [the plaintiff] damage." 383 U.S. 53, 64–65, 86 S.Ct. 657,

9. A "labor dispute," as defined by the National Labor Relations Act, "includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee." 29 U.S.C. § 152(9).

15 L.Ed.2d 582 (1966); *see also Old Dominion Br. No. 496, Nat. Ass'n Letter Car. v. Austin,* 418 U.S. 264, 273, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974) ("libel actions under state law were pre-empted by the federal labor laws to the extent that the State sought to make actionable defamatory statements in labor disputes which were published without knowledge of their falsity or reckless disregard for the truth").

Some courts have extended the *Linn* rationale to apply the *New York Times* standard to situations beyond the traditional definition of "labor dispute." In *Henry v. Nat'l Ass'n of Air Traffic Specialists, Inc.,* No. 93–2526, 1994 WL 406550, at *2 (4th Cir.1994), the Fourth Circuit held that the "actual malice" standard applied where other board members sent letters to the union membership about their decision to remove the former executive director from his position. The court explained that the plaintiff was a public figure and the statements were "made in the context of a labor dispute." *Id.* at *2. The court acknowledged that this was "technically not a labor management dispute," but found that "this sort of intra-union political dispute" was similar to a labor management dispute "since both involved two sides vying for the good opinion (and votes) of the union membership." *Id.* at *3 n. 5 (citations omitted). Similarly, in *Sullivan v. Conway and Int'l Brotherhood of Electrical Workers,* the Seventh Circuit explained that for communications with union officers and members concerning union business, "[f]ederal labor law preempts state defamation law when applied in ways that interfere with the internal management of unions." 157 F.3d 1092, 1099 (7th Cir.1998); *see also Nat'l Ass'n of Government Employees, Inc. v. Nat'l Federation of Federal Employees,* 844 F.2d 216, 220 (5th Cir.1988) ("the policy of encouraging 'uninhibited, robust, and wide-open' debate on matters of public concern extends to labor-management disputes, [so] these standards apply in actions brought by a union for defamatory statements circulated during an election campaign").

 In the instant case, although the alleged defamatory statements to union membership and among union officials do not arise from a traditional "labor dispute," they are similar to the statements in *Henry* and *Sullivan* in that they involve issues relevant to the union's support of the successor administration and union politics, even though they did not occur in the context of a campaign.[10] Thus, the plaintiff must show that the defendants acted with "actual malice" in order to recover.

### B. Application of the "Actual Malice" Standard

As discussed above, the plaintiff must prove "actual malice" in order to recover. In *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court held that there is "actual malice" where a statement is made with knowledge that the statement was false or where it was made with reckless disregard as to its veracity. *See also Law Firm of Daniel P. Foster, P.C. v. Turner Broadcasting System, Inc.,* 844 F.2d 955, 959 n. 5 (2d Cir.1988) ("a public figure plaintiff ... or private figure plaintiff involved in a matter of public concern ... has the burden to establish falsity."). In *Bleich v. Ortiz,* the Connecticut Su-

---

**10.** Also, as the defendants argue, labor union matters are often deemed to be matters of public concern. *See, e.g., Jean v. Dugan,* 20 F.3d 255, 262 (7th Cir.1994) (statements pertained to a matter of public concern because "they arose from a dispute with a contractor over obligations to contribute to a union's fringe benefit funds and related to a serious disagreement over two elected officials of a large ... local of a prominent labor union").

preme Court explained that "malice is not restricted to hatred, spite or ill will against a plaintiff, but includes any improper or unjustifiable motive." 196 Conn. 498, 504, 493 A.2d 236 (1985).[11]

Here, the plaintiff has provided insufficient evidence for a jury to find that any statement made by Pyzewski or Galazin was false.[12] Assuming arguendo that the plaintiff had shown a statement to be false, the plaintiff has offered no evidence that could support a conclusion that Pyzewski made a false statement with actual malice, that is, intentionally or with reckless disregard for its veracity. Similarly, the plaintiff has not presented evidence sufficient to create a genuine issue as to whether any statement by Galazin was made with "actual malice." The plaintiff's assertions about Galazin having a conflict with Cox are insufficient to create a genuine issue as to Galazin's intent in making the alleged defamatory statements. Furthermore, the fact that Galazin signed the check paid to Cox's attorney does not support a conclusion that Galazin had an improper motive in making statements about the attorney being Cox's personal attorney. On the other hand, the letter from Attorney Seamon is addressed to Cox in his individual capacity, rather than to Cox as president of Local 240, and the substance of Seamon's letter concerns Cox's individual compliance with the demands of the Department of Revenue Services, rather than Local 240's compliance; Local 240 is not even mentioned in Seamon's letter. In addition, the wage garnishment letter from the Department of Revenue Services addressed to the APWU identifies Cox, in his individual capacity, as a debtor, and directs the APWU to remit portions of Cox's wages to satisfy his personal debt. The most logical inference based on the evidence produced is that the work performed by Seamon constituted personal legal services for Cox, rather than services for Local 240.

The plaintiff has failed to create a genuine issue as to whether Pyzewski or Galazin acted with actual malice. Accordingly, the defendants' motion for summary judgment should be granted.

## IV. CONCLUSION

For the reasons set forth above, the defendants' Motion for Summary Judgment (Doc. No. 94) is hereby GRANTED.

The Clerk shall enter judgment in favor of the defendants and close this case.

It is so ordered.

---

**11.** In *Torosyan*, the Connecticut Supreme Court pointed to this language and questioned whether a lower standard of recklessness than "actual malice" could be utilized to overcome a qualified privilege. 234 Conn. at 30 n. 12, 662 A.2d 89. Under either formulation, however, the plaintiff has not met his burden.

**12.** At common law, "once a statement [is] shown to be defamatory, falsity [is] presumed." *Snyder v. Cedar,* No. NNHCV010454296, 2006 WL 539130, at *11 (Conn.Super.Ct. Feb. 16, 2006). Truth is an affirmative defense which must be asserted by the defendant. *Cweklinsky v. Mobil Chemical Co.,* 267 Conn. 210, 228–20, 837 A.2d 759 (2004). However, where actual malice must be proven, the burden to demonstrate that the defendant's statements are false lies with the plaintiff. *See Perruccio v. Arseneault et al.,* 7 Conn.App. 389, 392, 508 A.2d 831 (1986). Even when a private individual seeks recovery for statements of public concern, the plaintiff must prove falsity. *See Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 777, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986) (discussing media defendants). While the plaintiff points to a DOL audit report and notes the absence of particular allegations in that audit report and the APWU audit, the plaintiff fails to produce sufficient evidence to support a conclusion that the statements are untruthful.